613 F.2d 224
 10 Envtl. L. Rep. 20,264
 Melton E. BAKER, Plaintiff-Appellant,
v.
UNITED STATES of America; Cecil D. Andrus, Individually and
as Secretary of the Interior; Stanley Grunewald,
Individually and as District Ranger of the Forest Service of
the United States, Department of Agriculture, Defendants-Appellees.
 No. 77-2783.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 11, 1980.
 
 Robert J. Cruse, Phoenix, Ariz., for plaintiff-appellant.
 Raymond N. Zagone, Washington, D. C., argued for defendants-appellees; Michael A. Johns, Asst. U. S. Atty., Phoenix, Ariz., James W. Moorman, Washington, D. C., on the brief.
 Appeal from the United States District Court for the District of Arizona.
 Before SNEED and ANDERSON, Circuit Judges, and PORT,* District judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 This court is called upon to review an administrative extension of the marketability test which is used for proving the validity of mining claims. This extension adds a new element, that is, the claimant must now prove that he or she has not claimed "too much" of the mineral in question. After a thorough review of the mining laws, we conclude that there is no basis to support the Too much rule. We therefore vacate the judgment of the district court which had affirmed the decision of the Interior Board of Land Appeals (IBLA). 23 IBLA 319 (1976).
 
 I. FACTS
 
 2
 The defendants concede that there is no dispute about the facts of this case. In 1952 the appellant Baker began to mine cinders from a cinder cone in the Coconino National Forest near Flagstaff, Arizona. Baker filed a patent application for five placer mining claims on the volcanic field in 1965. The claims were described as Wildcat Hill numbers one through five.
 
 
 3
 The Bureau of Land Management, at the request of the Forest Service, began administrative proceedings against Baker's claims in 1966. Cancellation of all the Wildcat Hill claims was initially sought, but the allegations concerning the fifth claim were later dismissed from the complaint. The proceedings below decided the validity of the remaining four Wildcat claims.
 
 
 4
 After conducting a five-day hearing, a hearing officer validated all four of Baker's claims in 1970. The Forest Service then appealed this decision to the IBLA. Although the IBLA agreed with the factual findings made by the hearing officer, the patents on the number one and four claims were declared null and void, while the validity of the number two and three claims was upheld. The IBLA based its decision on its finding that all four of the claims, considered together, covered 15 million tons of cinders. This was, according to the IBLA, simply too much. The second and third claims were singled out for approval because most of Baker's workings and improvements were located on them.
 
 
 5
 Baker applied for review of the IBLA decision in the district court which had jurisdiction under 28 U.S.C. § 1331(a). See Andrus v. Charlestone Stone Products Co., 436 U.S. 604, 607 n. 6, 98 S.Ct. 2002, 2005, n. 6, 56 L.Ed.2d 570 (1978); Doria Mining & Engineering Corp. v. Morton, 608 F.2d 1255, 1256 n. 1 (9th Cir. 1979). On cross motions for summary judgment, the district court dismissed the complaint and action. Baker then filed a timely notice of appeal to this court which has jurisdiction under 28 U.S.C. § 1291.
 
 II. MINING LAWS
 
 6
 The basic philosophy underlying federal mining law is that all valuable mineral deposits on federally-owned mineral land are open to exploration and purchase. 30 U.S.C. § 22. Generally, by complying with certain procedural requirements, a person may locate a claim on federal land. Charlestone Stone Products Co., supra, 436 U.S. at 606, 98 S.Ct. at 2004. One who does so gains the exclusive right to possess the land and extract minerals from it. Id.
 
 
 7
 At issue in the present case is whether Baker's first and fourth claims were valuable mineral deposits so as to come within the terms of 30 U.S.C. § 22.
 
 
 8
 Over the years, two complementary tests have been developed for determining whether a mineral discovery is valuable. Under the prudent-man test, "the discovered deposits must be of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine . . . .' " United States v. Coleman, 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968), Quoting Castle v. Womble, 19 LD 455, 457 (1894). The marketability test requires a showing that the mineral can be extracted and marketed at a profit. Coleman, supra, 390 U.S. at 600, 88 S.Ct. at 1329. In Foster v. Seaton, 106 U.S.App.D.C. 253, 271 F.2d 836 (D.C.Cir.1959), the marketability test was explained as follows:
 
 
 9
 "Thus, such a 'mineral locator or applicant, to justify his possession, must show that by reason of accessibility, Bona fides in development, proximity to market, Existence of present demand, and other factors, the deposit is of such value that it can be mined, removed and disposed of at a profit.' " (citations omitted)
 
 
 10
 106 U.S.App.D.C. at 255, 271 F.2d at 838 (referred to as the Foster v. Seaton test.) This court has specifically approved the Foster v. Seaton test. Verrue v. United States, 457 F.2d 1202, 1203 (9th Cir. 1972).
 
 
 11
 Since common varieties of cinder, such as that claimed by Baker, were removed from location under the mining laws on July 23, 1955, the validity of his claims must be tested as of then.[1]
 
 
 12
 In its decision, the IBLA agreed with the hearing officer that Baker had satisfied both the "prudent-man" and "marketability" tests. The IBLA found that "Baker discovered a valuable deposit of common variety cinders prior to July 23, 1955, for which there was an existent demand, that there was an adequate access to the deposit, the deposit was within reasonable proximity to the market, and that he then initiated a bona fide effort to develop a mine." 23 IBLA at 332. By this the IBLA held that Baker had met the Foster v. Seaton test for proving marketability. After concluding that Baker had met the two traditional tests, the IBLA went on to find that Baker had located claims in excess of the reasonably anticipated market need for cinders (the Too much Test). Because of this, the IBLA held that Baker's less developed claims one and four were void for lack of discovery.
 
 III. STANDARD OF REVIEW
 
 13
 In reviewing decisions of the IBLA, this court exercises a limited standard of review. Multiple Use Inc. v. Morton, 504 F.2d 448, 452 (9th Cir. 1974); See Henrikson v. Udall, 350 F.2d 949, 950 (9th Cir. 1965), Cert. denied, 384 U.S. 940, 86 S.Ct. 1457, 16 L.Ed.2d 538. We cannot merely substitute our judgment for that of the IBLA. Multiple Use Inc., supra, 504 F.2d at 452; See United States v. Consolidated Mines & Smelting Co., Ltd., 455 F.2d 432, 448 (9th Cir. 1971). Our review is limited to an examination of whether the decision of the IBLA was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law. 5 U.S.C. § 706; See United States v. Wharton, 514 F.2d 406, 408-409 (9th Cir. 1975).
 
 
 14
 Baker's central argument on appeal is his challenge to the legal standard (the Too much test) which was applied by the IBLA to invalidate claims one and four. Because there is no dispute over the facts, the substantial evidence standard has no bearing on this case and our review is therefore limited to the IBLA's determination of the applicable law. See Ballard E. Spencer Trust, Inc. v. Morton, 544 F.2d 1067, 1069 (10th Cir. 1976). Generally, great deference is shown to an administrative agency's interpretation of the law which it is charged with administering.[2] Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). However, the courts do not merely "stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965), Quoted in Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). Nor will the courts "defer to an administrative construction where there are compelling indications that it is wrong." Marathon Oil Co. v. Kleppe, 556 F.2d 982, 986 (10th Cir. 1977). With these considerations in mind, we now turn to the Too much test which was relied upon to invalidate Baker's claims one and four.
 
 IV. THE TOO MUCH TEST
 
 15
 Interior[3] argues that the mining laws, its own decisions, and a single court decision established the excess reserve or the Too much test, and support its application to the present case.[4] Our examination leads us to the opposite conclusion.
 
 
 16
 The only court decision[5] relied upon by Interior is this court's decision in Clear Gravel Enterprises v. Keil, 505 F.2d 180 (9th Cir. 1974), Cert. denied, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 87. However, Clear Gravel cannot be read as establishing or even supporting a Too much test. In that case this court was merely reviewing whether there was substantial evidence to support the finding that the claimant had failed to satisfy the marketability test. In a brief per curiam decision we made the following observation:
 
 
 17
 "While the marketability of the mineral could have been demonstrated by the Appellant by a showing of its accessibility, its proximity to the market, the demand for it and by the Appellant's bona fide efforts to develop the claims and compete in the market with the product extracted from those claims, nonetheless, the record demonstrates that Appellant's evidence fell far short of the required showing."
 
 
 18
 505 F.2d at 181. This was simply a restatement and application of the Foster v. Seaton test for determining marketability. The decision then went on to summarize some of the evidence. This had included the testimony of two government experts who said that the minerals could not be extracted, removed and marketed at a profit, and the fact that the contested claims had never been developed during the relevant period because of the appellant's other holdings. By mentioning the claimant's other holdings, this court was merely looking at the actual development of the claims in question, a factor which is properly considered under the marketability test.[6] We did not intend to add a new factor to the marketability test, nor did we intend to implicitly approve the Too much test.
 
 
 19
 Interior cites three IBLA decisions as support for the Too much rule: United States v. Anderson, 74 I.D. 292 (1967); United States v. Bunkowski, 5 IBLA 102 (1972); and United States v. Harenberg, 11 IBLA 153 (1973). However, none of these decisions can be viewed as even persuasive authority since the first two share the same faulty premise and the last decision did not even address the issue.
 
 
 20
 The IBLA observed in Harenberg that it was not necessary to consider the excess reserve issue. 11 IBLA at 158. That was the sum total of the discussion. This court refuses to consider what is not discussed in a decision as precedent for establishing such a radical departure from previous law.
 
 
 21
 Neither Bunkowski nor Anderson relies on any statutory authority in support of the Too much test. The only authority which is relied upon is the district court decision in Osborne v. Hammit, 377 F.Supp. 977 (D.Nev.1964). See Anderson, supra, 74 I.D. at 302-303; Bunkowski, supra, 5 IBLA at 122-125. However, an examination of the Osborne decision reveals that it cannot be used as a foundation for the Too much test and that the reliance on it in Bunkowski and Anderson was misplaced. In Osborne the district court was reviewing an Interior Department decision to cancel mining claims for sand and gravel located near Las Vegas, Nevada. The court observed that the contested claims were similar to other sand and gravel claims which covered over 100,000 acres of land in the Las Vegas area. Furthermore, the claimants had made no attempt to develop the contested claims. The court, in approving Interior's holding that the claimants had failed to satisfy the marketability test, followed the Foster v. Seaton test. The court said that, had the claimants actually begun production of the sand and gravel and successfully entered the market, then the Foster v. Seaton marketability test would have been satisfied. 377 F.Supp. at 985. Because the claimants had never attempted to work their claims, the court refused to credit their "speculative, hypothetical and theoretical testimony" which was offered to show that they could have extracted and marketed the mineral. 377 F.Supp. at 985-986.
 
 
 22
 The Osborne decision obviously supports neither the result nor the test which was used in the present case. Baker had, in fact, developed and marketed the cinders from claims one and four. Access roads were on the claims. Baker was not relying upon speculative, hypothetical, or theoretical proof, since he had actually extracted and marketed cinders from the contested claim at a profit. Furthermore, the IBLA concluded that Baker had satisfied the Foster v. Seaton formulation of the marketability test. It was only after drawing that conclusion that the IBLA went on to apply its Too much or excess reserve test to Baker's claims. Although the Interior decisions do support such a test, they are both based upon a misreading of Osborne, which we choose not to follow.
 
 
 23
 Although Interior claims statutory support for the Too much rule, our examination of the statutes and their legislative history revealed nothing which even inferentially supports such a departure from previous mining practice. The Too much test limits the overall amount of mineral and land an individual can claim under the mining laws. Although the mining laws limit the size of claims,[7] they have never set a limit on the number of claims an individual may stake and work.[8] The validity of a claim has always been determined by an inquiry into that particular claim, not by an examination of the individual's other claims. The Too much test changes the focus of the relevant inquiry. Although Congress has addressed various abuses under the general mining laws,[9] it has never attempted to either limit the amount of mineral, or the overall number of claims, which can be patented by an individual.
 
 
 24
 Moreover, the Too much rule is not workable and is not susceptible of practical application. Under the rule, Interior reserves to itself the decision as to how slowly or rapidly a claim can be worked. Will the large well-endowed corporation, association or individual, with extensive and valuable open-pit or subsurface claims, be subject to the same standards as the sole "pack-string" prospector? Will claimants of all variety now be forced to locate and claim only mediocre discoveries, exploitable within 1, 5 or 10 years? Will claimants be forced to overlook those claims with extremely rich and extensive deposits which may require many more years to develop and exploit, but which are by all present day statutes and relevant decisions legally exploitable claims? Upon what objective, predictable and manageable criteria will government mining law administrators and the IBLA base important and far-reaching decisions in arriving at a conclusion of Too much? To what locality or geographic region will it apply? To what classification of mineral deposits will it apply? To what geologic structures will it apply? The list is virtually endless. The Too much rule is, in our view, a wholly unreliable subjective analysis, resting too much in the eye of the administrative beholder.
 
 
 25
 The IBLA exceeded its discretionary and statutory powers when it adopted its Too much or excess reserves rule. Although Congress may see fit to deal with the issue, it has never done so. The IBLA decision amounts to a legislative enactment by an executive tribunal. The IBLA possesses no such authority under our system of separation of powers.
 
 V. CONCLUSION
 
 26
 In sum, we hold that the IBLA's adoption of the Too much rule was an abuse of discretion which was contrary to existing mining law. The result reached was arbitrary and capricious. The IBLA found that Baker had satisfied both the prudent man and the marketability tests, but went on to invalidate claims one and four under the Too much test. Since claims one and four were otherwise valid, Baker is entitled to a patent for them.
 
 
 27
 We therefore vacate the dismissal of the instant complaint and remand to the district court for it to enter an order directing the IBLA to validate Baker's claims one and four.
 
 
 28
 VACATED and REMANDED, with directions.
 
 
 
 *
 The Honorable Edmund Port, Senior United States District Judge for the Northern District of New York, sitting by designation
 
 
 [1]
 In 1955, Congress adopted an Act which was commonly referred to as The Surface Resources Act. 69 Stat. 367 Et seq.; 30 U.S.C. §§ 601, 611 Et seq. Section 3 of this Act specifically provided that: "(a) deposit of common varieties of sand, stone, gravel, pumice, pumicite, or Cinders shall not be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter (July 23, 1955) located under such mining laws . . . ." (emphasis added) See 30 U.S.C. § 611. Since Baker's claims were located prior to 1955, this broad exclusion did not affect his claims except to set the time (July 23, 1955) for proving the validity of his discovery
 
 
 [2]
 This deference is by no means absolute, as the Supreme Court has stated:
 "We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."
 Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).
 
 
 [3]
 For purposes of clarity we refer to the defendants as Interior although the named defendants are actually from the Department of Agriculture as well as the Department of Interior
 
 
 [4]
 In its most ingenuous argument, the government says that a claimant (such as Baker) should not be able to curtail competition by removing a mineral source from the public lands which the government would otherwise be able to sell itself under 30 U.S.C. § 601. In fact, the government has offered Baker the opportunity, for a price, of continuing his mining operations on the disputed first and fourth claims. And so the government maintains two rather contradictory positions in regard to the two disputed mining claims. In its management of the disputed claims pending this appeal, the government apparently believes that, in view of the foreseeable needs of the market and Baker's need for the mineral, Baker may want to mine the disputed claims for a reasonable fee. However, for purposes of this lawsuit, the government argues that Baker had located an excess supply of cinders in view of his needs and the foreseeable needs of the market
 
 
 [5]
 The recent case of Hallenbeck v. Kleppe, 590 F.2d 852 (10th Cir. 1979), does not support Interior's Too much test. In Hallenbeck the plaintiffs argued that the district court erred by holding that a mineral claimant cannot hoard valuable minerals. The Tenth Circuit rejected this by finding that the lower court had properly applied the test of Present marketability. 590 F.2d at 859. Moreover, there had been No sales from the contested claims in Hallenbeck. 590 F.2d at 857
 
 
 [6]
 The actual development of a contested claim is only one of several factors which are considered. It is not the only consideration. See Edwards v. Kleppe, 588 F.2d 671, 673 (9th Cir. 1978); Melluzzo v. Morton, 534 F.2d 860, 863 (9th Cir. 1976); and Barrows v. Hickel, 447 F.2d 80, 82 (9th Cir. 1971)
 
 
 [7]
 See 30 U.S.C. §§ 35, 36 (limit on the size of placer claims); 30 U.S.C. § 23 (limit on the size of claims on veins or lodes)
 
 
 [8]
 In United States v. California Midway Oil Co., 259 F. 343 (S.D.Cal.1919), Aff'd. 279 F. 516 (9th Cir. 1922), Aff'd. 263 U.S. 682, 44 S.Ct. 136, 68 L.Ed. 504 (1923), the court made the following observation:
 ". . . There is so far no law of Congress or regulation made in pursuance thereof limiting the number of placer mining claims an individual or association of individuals may make. On the contrary, the policy of the government seems to be to encourage the development of its mineral resources and to offer every facility for that purpose."
 
 
 [259]
 F. at 351-352. Judge Bean's statement about there being "no law" is just as applicable today as it was when it was made in 1919. Judge Ross of this court, concurring in the affirmance of Judge Bean's opinion, noted that "Congress has never fixed any limit to the number of (claim) locations that may be made by the same person or persons . . . ." California Midway, supra, 279 F. at 521 (Ross, J., concurring)
 For other cases which hold that there is no limit on the number of claims an individual may stake, see for example: Houck v. Jose, 72 F.Supp. 6, 9-10 (S.D.Cal.1947), Aff'd. 171 F.2d 211 (9th Cir. 1948) ("an association Is not limited to one (mining) Location . . . ."); United States v. Brookshire Oil Co., 242 F. 718, 721 (S.D.Cal.1917) ("(i)t is true there is no limitation as to the number of mining claims an individual or association of individuals may locate . . . ."); Riverside Sand & Cement Mfg. Co. v. Hardwick, 16 N.M. 479, 120 P. 323, 324 (1911) ("there is no limit to the number of claims which may be located by one person or association of persons. . . .").
 
 
 [9]
 For instance, when Congress passed The Surface Resources Act (See n. 1, Supra ), it sought to correct various abuses under the mining laws. See H.R.Rep.No. 730, 84th Cong., 1st Sess., Reprinted in 2 (1955) U.S.Code Cong. & Admin.News, p. 2474. One problem was the location of claims for purposes other than mining, prospecting, processing or related activities. The location of Too much of a mineral by any one claimant was not addressed, and implicitly may not have been considered either a problem under, or an abuse of, the mining laws. Especially, in view of the fact that Congress, with this Act, "did not intend to change the basic principles of the mining laws." Converse v. Udall, 399 F.2d 616, 617 (9th Cir. 1968), Cert. denied, 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569